## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CHRISTOPHER SPENCE, an individual, on his on behalf, and on behalf of all persons similarly situated, | ) ) ) )  Civil Docket No.  1:06-cv-349-JM |
| 67 Old Rockingham Road Salem, NH 03079 | ) ) ) ) ) |
| Plaintiff, | ) )  CLASS ACTION ) )  JURY TRIAL DEMANDED |
| v. | ) ) |
| BORDERWARE TECHNOLOGIES, INC., a Canadian corporation, and DOES 1 to 10, individuals. | ) ) ) ) |
| 500 Burnhamthorpe Rd West #502 Mississauga ON, Canda L5B 3C2 | ) ) ) |
| Defendant. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Christopher Spence ("Plaintiff"), by his attorneys, states this Class Action Complaint against Defendant BorderWare Technologies, Inc. ("BorderWare" or "Defendant"). Plaintiff's allegations are based on information and belief, except to his own actions, which are based on knowledge. Plaintiff's allegations on information and belief are based on the investigation of his counsel, and facts that are a matter of public record.

### Nature of the Claim

1.  This class action claim against BorderWare arises out of BorderWare's false promotion and advertising of its antispam appliance MXtreme Mail Firewall ("MXtreme").

2.  MXtreme is an antispam appliance used to eliminate unsolicited commercial email ("spam"). BorderWare promoted and advertised MXtreme as appropriate for use by Internet service providers ("ISPs") who managed Internet connectivity and email service for multiple clients (as opposed to local network operators who manage only their only internal network). Further, Borderware claimed that MXtreme generally identified very

1

few legitimate emails as spam (i.e., "false positives").

3.  BorderWare knew that both these functionalities were critical to a large class of MXtreme purchasers (including Plaintiff). However, BorderWare also knew that, in fact, MXtreme did not have the functionalities necessary for ISP use, nor was MXtreme's false positive rate as low as it claimed when it promoted MXtreme. Nonetheless, BorderWare used these false statements to advertise MXtreme at least from May 2004 to August 2005.

4.  These misrepresentations not only harmed the ISP customers who relied on them through the purchase of useless equipment, but also impaired the availability of email sent to ISP customers' facilities.

**5.**  BorderWare maintained these misrepresentations throughout negotiations with customers, including Spence.

6.  BorderWare's Misrepresentations violated, *inter alia*, the U.S. Computer Fraud and Abuse Act, the New Hampshire Consumer Fraud Act, the Canadian Competition Act, and Ontario common law torts of fraud and negligent misrepresentation. This lawsuit seeks to provide BorderWare's customers a remedy for BorderWare's deceptive advertising and promotion of the MXtreme.

**Parties**

7.  Christopher Spence ("Plaintiff") is a New Hampshire resident who does business as Algorithm Consulting in Windham, New Hampshire.

8.  Defendant BorderWare Technologies, Inc. is a Canadian corporation which maintains and at all relevant times maintained its headquarters at 500 Burnhamthrope Road West No. 502, Mississaugua Ontario, L5B 3C2. Founded in 1994, BorderWare is the benchmark provider of messaging security solutions for enterprises and government. BorderWare has more than 8000 customers with systems deployed at various military,

2

intelligence, defense, national security agencies, and corporations worldwide.

9.  Defendants Does 1 to 10 are officers, agents, and employees of BorderWare. They conducted and/or participated in the conduct BorderWare's affairs through the activity described herein and are individually culpable for BorderWare's corporate misconduct. The identity of the Does is unknown, but is readily discoverable in litigation or arbitration.

## Jurisdiction and Venue

10. The aggregate claims of Plaintiff and the proposed class members substantially exceed the sum or value of $5,000,000, and there is diversity of citizenship between proposed class members and Defendant. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d).

11. Plaintiff asserts federal claim on behalf of himself and all others similarly situated. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

12. This Court has personal jurisdiction over the Defendant under RSA 293-A:15:10 by virtue of the Defendant's commission of tortious acts in this District. Venue is also proper in this District under 28 U.S.C. § 1391(a)(2).

## The Market for Antispam Appliances

13. Email is a critical form of communication in any contemporary organization. Email users receive email from their network's email servers. Some organizations maintain their email servers on their own local network. Many other organizations and many individual users use Internet service providers ("ISPs") to both provide Internet connectivity and email service (including maintaining email servers). As the cost of sending email is very low, spam has become so prevalent as to present a massive problem for email users. At its present-day levels, spam threatens to drown out legitimate email by sheer volume, to cripple network connectivity, and to expose users to viruses, trojan horses, and other

1159985.1

forms of malware.

14.   Consequently, a market has evolved to eliminate spam before it reaches individual email users. For instance, and other manufacturers produce antispam appliances, specialized routers or computers which filter spam before it reaches users' email servers. Defendant's MXtreme is an antispam appliance.

15.   Because email is a critical form of communication, one of the most important criteria for evaluating an antispam device is the rate at which the device incorrectly identifies legitimate email and spam (i.e., "false positive" rate). Because antispam appliances eliminate email before it reaches a user's email inbox, a user may never learn that a legitimate, critical email failed to reach him.

16.   Antispam devices "quarantine" email identified as spam, because any false positive may be a critical email. Users' ability to retrieve emails from an antispam device's "quarantine" is as critical as the antispam device's false positive rate. Likewise, users' ability to white-list, or specifically designate a particular email source as legitimate, is also important. Moreover, antispam devices must provide *users* these capabilities. ISPs must rely on individual users to manage their own quarantines and white lists, both because ISPs cannot decide for users decide what email is legitimate and because the workload involved in administrating all an ISPs' individual email accounts is not tenable.

17.   Consequently, a manufacturer's representations about an antispam appliance's false positive rate, and its quarantine and white-listing capabilities are necessarily material to any purchaser.

18.   Antispam devices have two basic classes of prospective purchasers. The first class is only concerned with protecting its own internal network from spam. This class is typically limited to large organizations that operate their own network. The second class are ISPs, which provide network connectivity and email service to multiple clients.

4

19.     The domain name portion of an email address follows the @ symbol. (Thus, the domain name for webmaster@nhd.uscourts.gov is nhd.uscourts.gov.) The domain name is used to direct email to the correct email server, where a user can access the messages sent to his address.

20.     Another important criteria for antispam devices is whether they can accommodate multiple email address domains. ISPs which offer email service to multiple clients, with each client using its own domain name, must have the ability to receive email sent to multiple domain names. While prospective purchasers which only operate their own network may have but a single domain name, they may also have multiple domain names. In particular, large organizations frequently use several tertiary domain names (for instance, nhd.uscourts.gov, nysd.uscourts.gov and ilnd.uscourts.gov). Thus, representations about an antispam appliance's ability to process multiple domain name are necessarily material to any purchaser using multiple domain names.

**BorderWare's Misrepresentations to the Class**

21.     BorderWare promoted and advertised MXtreme as "enabl[ing users] to easily manage multiple email domains or work groups from a single web-based console" in a document titled MXtreme Product Overview, dated December 2003,  a copy of which is attached as Exhibit A. Spence received this document from a BorderWare representative by email in May 2004, a copy of which is attached as Exhibit B.

22.     BorderWare also promoted and advertised MXtreme as having an extremely low false positive rate. MXtreme Product Overview claimed MXtreme provided "zero lost messages for your enterprise." Ex. A at 2. BorderWare's website also claimed MXtreme "provide[d] remarkably low ratios of 1 in 100,000 false positives." The BorderWare maintained this claim on its website from at least May 2004 to March 2005, automatically archived copies of which are attached as Exhibits C and D.

23.    Finally, BorderWare claimed that MXtreme enabled email "[u]sers [to] build their own personalized whitelists and manage their own quarantine areas." Exs. C; D.

24.    The misrepresentations in the three previous Paragraphs ("Class Misrepresentations" or simply "Misrepresentations") were made to every member of the Class.

### BorderWare's Specific Misrepresentations to Spence

25.    Spence provides managed email service to other enterprises. It is essential to his business (and to the business of every other Class member) that his network equipment, and specifically, his antispam equipment, process email for a variety of clients with multiple domain names.

26.    For three months prior to his purchase, Spence consulted with BorderWare promotional material about the MXtreme functionality and repeatedly inquired with BorderWare employees whether MXtreme would fit his needs. Throughout this time, Spence was very clear that he required multiple domain name functionality and that MXtreme otherwise had to be appropriate for his environment, and was consistently assured that it was. A BorderWare employee acknowledged that Spence "made it very clear to me that multiple domain support is necessary for his environment" in an email dated September 3, 2004 and attached as Exhibit E.

27.    In addition to the General Misrepresentations above, Spence was also told that the MXtreme was appropriate for his environment, and specifically would support multiple domains and was used by other ISPs. Spence was given these statements, *inter alia*, by David Schultz in web conference on or about July 20, 2004 and repeatedly over telephone by Robert Piccolo during the three months prior to Spence's purchase.

28.    Spence purchased two MXtreme appliances in August 5, 2004. A copy of a reprinted invoice is attached as Exhibit F. However, MXtreme did not have the functionality BorderWare advertised.

6

29.     After Spence discovered that MXtreme did not work as advertised, BorderWare

represented that future changes to the MXtreme software would provide MXtreme with

the functionalities described in its advertising. The representations include:

    (a)     emails from an BorderWare employee, dated August 10, 2004 and
attached as Exhibits G and H, that the 5.0 MXtreme version 5.0 was due in
October 2004 and would provide "domain based" white listing and
quarantine;

    (b)     an email from an BorderWare employee, dated August 31, 2004 and
attached as Exhibit I, that a patch for the then-current version of MXtreme
would be "released in a few weeks" and "support multi-domain"
functionality;

    (c)     an email from an BorderWare employee, dated September 24, 2004 and
attached as Exhibit J, that an upcoming patch would provide MXtreme
with "[m]ulti-domain support" for "non-local hosts";

    (d)     an email from an BorderWare employee, dated October 13, 2004 and
attached as Exhibit K, that the upcoming patch was just being packaged
and would be available as early as tomorrow, together with another email
dated November 29, 2004 and attached as Exhibit L, that the patch had
been delayed and would not go out until the end of that week;

    (e)     and an email from an BorderWare employee, dated February 8, 2005 and
attached as Exhibit M, that BorderWare was "committed to going the
extra mile to ensure your long-term satisfaction with the quality and
support of our product and services."

30.     The misrepresentations alleged in the three previous Paragraphs ("Specific

Misrepresentations") induced Spence to devote an enormous amount of time to testing

MXtremes per BorderWare's instructions and attempting to configure them to function as

they were advertised, to incorporate them into his business. This work was of substantial

benefit to BorderWare. A BorderWare vice-president indicated in an email dated August

31, 2004 and attached as Exhibit N that Spence's input was "useful and valuable" and

would be used in future product development.

31.     The Specific Misrepresentations also induced Spence to purchase a substantial amount of

marketing services (including graphical design and web design) for his business that were

adapted to MXtreme and could not be retrofitted to another product.

7

**MXtreme's Functionality**

32. At the most basic level, MXtreme failed to provide false positive ratios anywhere near a low as 1 in 100,000. A BorderWare employee acknowledged in an email dated February 9, 2005 and attached as Exhibit O that the false negative and false positive ratios of Spence's MXtremes "have gotten better over time but are not what they should be." Ex. O at 1.

33. Further, MXtreme did not support multiple domain names in a ISP (multiple domain name) environment. MXtremes would process email for one domain name normally. However, despite nearly a year of Spence's assistance, BorderWare was never able to configure MXtreme to provide users with quarantine or white-listing functionality with additional domain name. In addition to MXtreme's basic failure to provide the false positive rates BorderWare advertised, this defect rendered MXtremes totally unsuitable for a customer, such as an ISP, using multiple domain names.

**BorderWare Refuses to Refund Spence's Purchase Money**

34. BorderWare knew the Class Misrepresentations were material to its customers, and acknowledged that MXtreme did not yet provide the functionality described in the Class Misrepresentations. A BorderWare employee stated that "carrier and ISP businesses" required "support for multi-domains [and] pushing admin capabilities [i.e., white listing and quarantines] down to the end user," just as Spence's business did. Ex. O at 1.

35. By March 2005, BorderWare essentially stopped working with Spence to resolve the MXtreme's functionality defects and did not communicate with Spence for three months.

36. On July 18, 2005, after nearly a year of patiently working with BorderWare to resolve the issues that plagued MXtreme, Spence asked BorderWare to take back the defective MXtremes and return his purchase money.

37. On August 3, 2005, BorderWare's vice-president wrote an email, attached as Exhibit P,

which apologized for the delay, asked Spence to "be patient a little bit longer," and indicated he would "respond shortly." On August 8, 2005, just a few days after the anniversary of the date Spence purchased his MXtremes, the vice-president indicated that BorderWare would not refund Spence's money.

## Class Action Allegations

38.   Plaintiff brings this Complaint against Defendant on behalf of himself and all persons and entities which purchased an MXtreme for use with multiple domain names, regardless of their residence, pursuant to Federal Rule of Civil Procedure 23 (the "Class"). Plaintiff also brings this Complaint against Defendant on behalf of himself and all natural persons within a distinct subclass of Class members who reside, or operate a data storage or communications facility, in the United States (the "U.S. Subclass"). Excluded from both the Class and U.S. Subclass are i) any Judge or Magistrate presiding over this action and members of their families; ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers and directors; and iii) persons who properly execute and file a timely request for exclusion from the class and iv) the legal representatives, successors or assigns of any such excluded persons.

39.   **Numerosity:** The exact number of Class and U.S. Subclass members is unknown and is not available to Plaintiff, but it is clear that individual joinder of all members of either the Class or U.S. Subclass is impracticable. BorderWare claims it has over 8,000 customers. A significant proportion, even a majority, of those customers would attempt to use MXtreme for multiple domain names. Further, a significant proportion of Class members reside, or operate a data storage or communications facility, in the United States.

40.   **Class Commonality:** Common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual Class members. These

9

common questions include whether:

    (a)    Whether BorderWare's advertisements and promotions for the MXtreme represented that processed email for multiple domain names, provided white-listing and quarantine functionality to individual email users, and provided a false positive rate of 1 in 100,000;

    (b)    Whether BorderWare represented that MXtreme was generally suited for use by an ISP;

    (c)    Whether the Misrepresentations alleged above are false or misleading in a material respect;

    (d)    Whether BorderWare and the Does knew the Misrepresentations alleged above were false at the time it made them, or made with with reckless disregard for the truth;

    (e)    Whether, by its misconduct as set forth herein, BorderWare and the Does violated the Canadian Competition Act;

    (f)    Whether, by its misconduct as set forth herein, BorderWare and the Does committed the torts of deceit and/or negligent misrepresentation under Ontario law;

    (g)    Whether plaintiff and the Class are entitled to relief, and the nature of such relief.

41.    **U.S. Subclass Commonality:** Common questions of fact and law exist as to all members of the U.S. Subclass and predominate over the questions affecting only individual U.S. Subclass members. These common questions include whether:

    (a)    Whether BorderWare's Misrepresentations transmitted information to network and email facilities in the United States, and which Misrepresentations intentionally induced those facilities to purchase and install MXtreme;

    (b)    Whether the installation of MXtreme in network and email facilities in the United States impaired access to email, and required time, effort and money to repair, reconfigure and/or replace;

    (c)    Whether, by its misconduct as set forth herein, BorderWare violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

    (d)    Whether BorderWare's Misrepresentations were transmitted across interstate wires;

    (e)    Whether BorderWare's Misrepresentations constituted wire fraud under 18 U.S.C. § 1343;

10

(f)     Whether BorderWare's Misrepresentations to the U.S. Subclass constitute a pattern of racketeering activity;

(g)     Whether BorderWare is an enterprise involved in interstate activity, separate and distinct from the Does;

(h)     Whether the Does participated in BorderWare's conduct of its affairs through a pattern of racketeering activity;

(i)     Whether the U.S. Subclass was damaged in its business or property by such pattern of racketeering activity;

(j)     Whether plaintiff and the U.S. Subclass are entitled to relief, and the amount and nature of such relief.

42.    **Typicality:** Most of Plaintiff's claims are typical of the claims of other members of both the Class and U.S. Subclass, as the Plaintiff and other Class members sustained damages arising out of Defendant's wrongful conduct based upon the same transactions, upon the same misrepresentations, and upon the same material omissions which were made uniformly to the Plaintiff and the public.

43.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of both the Class and U.S. Subclass, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class or to the U.S. Subclass, and Defendant has no defenses unique to Plaintiff.

44.    **Predominance and Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the Class members individually to obtain effective relief from Defendants' misconduct. Even if the class members themselves could sustain such individual litigation, it would still not

11

be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## Class Allegations

45. **Does' Corporate Control:** Does 1 to 10 made the decision to have BorderWare, through its agents and employees, make the Class Misrepresentations. The Does had the authority to direct other BorderWare employees to make the Misrepresentations.

46. **Specifics of Class Misrepresentations:** The Class Misrepresentations related, as alleged above, to the MXtreme's false positive rate and its support for multiple domain names. The Class Misrepresentations were made to Class members through, *inter alia*, BorderWare's sales staff and its website.

47. **Falsity:** The Class Misrepresentations were false or misleading.

48. **Intent or Recklessness as to Falsity:** BorderWare and the Does knew that the Misrepresentations were false, or were at least reckless with respect to the falsity of the Misrepresentations.

49. **Intent as to Reliance:** BorderWare and the Does made the Class Misrepresentations for the purpose of selling MXtremes. BorderWare and the Does intended that the Class members rely on the Class Misrepresentations, regardless of whether the MXtremes suited Class members' business needs or not. In the alternative, BorderWare and the Does knew that Class members would rely on the Class Misrepresentations.

## Count I: Spence's Individual Claim
## Under the New Hampshire Consumer Fraud Act

50. Plaintiff incorporates the above allegations by reference as if set forth herein at length.

12

51.  Through the Class and Specific Misrepresentations alleged above, BorderWare represented that the MXtreme had uses, benefits and functionalities that it did not have.

52.  By making the Class and Specific Misrepresentations, BorderWare violated the NHCFA, RSA 358-A:2.

53.  By directing agents and employees of BorderWare to make the Class and Specific Misrepresentations, the Does violated the NHCFA, RSA 358-A:2.

54.  Spence seeks treble actual damages (including direct damages and consequential damages, including marketing expenses made in reliance of incorporating MXtreme into his business and time wasted attempting to configure the MXtreme to function as advertised) from BorderWare under the NHCFA, RSA 358-A:10. Spence also seeks an injunction against further NHCFA violations and statutory attorneys' fees award against BorderWare.

55.  Spence seeks treble actual damages from the Does under the NHCFA, RSA 358-A:10. Spence also seeks an injunction against further NHCFA violations and statutory attorneys' fees award against the Does.

## Count II: Violation of the Competition Act, R.S. 1985, c. C-34

56.  Plaintiff incorporates the above allegations by reference as if set forth herein at length.

57.  By making the General Misrepresentations, BorderWare violated the Competition Act, R.S. 1985, c. C-34, s. 52.

58.  By directing agents and employees of BorderWare to make the Class Misrepresentations, the Does violated the Competition Act, R.S. 1985, c. C-34, s. 52.

59.  Spence and the other Class members were damaged by the Class Misrepresentations.

60.  Plaintiff, on his own behalf and behalf of the other Class members, seeks direct damages and the full costs of Spence's investigation in connection with this case and of the proceedings from BorderWare under the Competition Act, s. 36.

1159985.1

61.   Plaintiff, on his own behalf and behalf of the other Class members, seeks damages and the full costs of Spence's investigation in connection with this case and of the proceedings from the Does under the Competition Act, s. 36.

## Count III: Deceit

62.   Plaintiff incorporates the above allegations by reference as if set forth herein at length.

63.   Spence and the other Class members relied on the Class Misrepresentations, purchased MXtremes, and were damaged thereby.

64.   Plaintiff, on his own behalf and behalf of the other Class members, seeks direct damages, punitive damages and costs from BorderWare.

65.   Plaintiff, on his own behalf and behalf of the other Class members, seeks direct damages, punitive damages and costs from the Does.

## Count IV: Negligent Misrepresentation

66.   Plaintiff incorporates the above allegations by reference as if set forth herein at length.

67.   In the alternative, BorderWare and the Does were negligent with respect to the Class Misrepresentations. They should have known that the Class Misrepresentations were false or misleading, and that Spence and the other Class Members would rely on the General Misrepresentations.

68.   Spence and the other Class members relied on the Class Misrepresentations, purchased MXtremes, and were damaged thereby.

69.   Plaintiff, on his own behalf and behalf of the other Class members, seeks direct damages, punitive damages and costs from BorderWare.

70.   Plaintiff, on his own behalf and behalf of the other Class members, seeks damages (including punitive damages) and costs from the Does.

## Count V: Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

71.   Plaintiff incorporates the above allegations by reference as if set forth herein at length.

14

72. Does 1 to 10 caused the Class Misrepresentations to be transmitted through BorderWare's website and sales staff.

73. Spence and the U.S. Subclass operate data storage and communications facilities, which are "protected computers" under the definition in 18 U.S.C. § 1030(e).

74. Through the Class Misrepresentations, BorderWare and the Does knowingly transmitted information to the Spence and the U.S. Subclass regarding MXtreme's false positive rates and support for multiple domain names that induced Spence and the U.S. Subclass into purchasing and installing MXtremes.

75. BorderWare and the Does knew the installation of the MXtremes would damage the data storage and communications facilities by misdelivering email, failing to provide a quarantine for false positives, and otherwise impairing users' access to data.

76. Spence and the U.S. Subclass relied on the Class Misrepresentations: their reliance was misplaced and to their detriment. As the MXtremes' lack of functionality directly conflicted with the Class Misrepresentations, the damage caused by installing the MXtremes was not authorized.

77. BorderWare and the Does violated 18 U.S.C. § 1030(a)(5)(A)(i) by making the Class Misrepresentations.

78. The Class Misrepresentations caused losses, the value of which exceeded $5,000 during the year after Spence and the other U.S. Subclass members relied on the General Misrepresentations.

79. Plaintiff, on his own behalf and behalf of the other U.S. Subclass members, seeks direct damages under 18 U.S.C. § 1030(g) from BorderWare.

80. Plaintiff, on his own behalf and behalf of the other U.S. Subclass members, seeks all losses recoverable under 18 U.S.C. § 1030(g) from the Does.

**Count VI: Violation of the Racketeer Influenced
and Corrupt Organizations Act, 18 U.S.C. § 1962**

81. Plaintiff incorporates the above allegations by reference as if set forth herein at length.

82. **Scheme to Defraud:** Does 1 to 10 participated and acted in concert in a scheme to defraud Spence and the other U.S. Subclass members. The Class Misrepresentations were an integral part of that scheme, and induced the Class members to purchase MXtremes which did not support their business needs.

83. **Interstate Wire:** The Class Misrepresentations were made using the interstate wires (to wit, they were made to U.S. persons by way of email, telephone call and Internet website from Ontario, Canada). The Does knew or reasonably should have known the Class Misrepresentations would use interstate wires.

84. **Racketeering Activity:** The Does' conduct constituted wire fraud and violated 18 U.S.C. § 1343. Violation of 18 U.S.C. § 1343 constitutes racketeering activity.

85. **Pattern of Racketeering Activity:** Spence and the other Class members relies on the Class Misrepresentations and purchased MXtremes, and were damaged thereby by the purchase of an antispam appliance that did not have the functionality their businesses required. Each time a U.S. Subclass member purchased an MXtreme in reliance on the Class Misrepresentations, the Does violated 18 U.S.C. § 1343. Many of these violations occurred during the course of selling the MXtreme. Where BorderWare's customers number in the thousands, it is likely that the wire fraud violations number in the thousands. These wire fraud violations are related to each other and, in fact, constitute multiple frauds executed from a single scheme. Further, the wire fraud violations are continuous: the scheme began at least in December 2003 and continued through at least August 2005.  Further, the wire fraud was part and parcel of BorderWare's legitimate business: the sale of MXtremes.

86. **Enterprise:** BorderWare is an enterprise involved in interstate commerce that is separate and distinct from the Does.

16

87.   **Participation in the Conduct of BorderWare's Affairs:** The Does participated in the conduct of BorderWare's affairs through the pattern of racketeering activity alleged above.

88.   **Business Damage Caused by Pattern of Racketeering Activity:** The pattern of racketeering activity caused economic and business injury to Spence and the other Class members.

89.   Plaintiff, on his own behalf and behalf of the other U.S. Subclass members, seeks treble damages, an injunction against further violations of the Racketeer Influenced and Corrupt Organizations Act, and a statutory award of costs (including attorneys' fees) under 18 U.S.C. § 1964(c) from the Does.

90.   WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor and against Defendant as follows:

    (a)    With respect to Count I, treble damages against BorderWare and the Does, an injunction against further violations of the New Hampshire Consumer Fraud Act, and statutory attorneys' fees under the New Hampshire Consumer Fraud Act;

    (b)    With respect to Counts II, III, and IV, declaring the action to be a proper class action and designating Plaintiff and his counsel as representatives of the Class;

    (c)    With respect to Counts II, III, and IV, awarding damages in an amount to be determined at trial, the full costs of investigation and proceedings, and equitable relief, including an accounting, a constructive trust and restitution, in an amount to be determined at trial, against the Does and BorderWare;

    (d)    With respect to Counts V and VI, declaring the action to be a proper class action and designating Plaintiff and his counsel as representatives of the U.S. Subclass;

    (e)    With respect to Counts V, and VI, awarding treble damages in an amount to be determined at trial, an injunction against further violations of the Racketeer Influenced and Corrupt Organizations Act, and costs (including attorneys' fees) under the Racketeer Influenced and Corrupt Organizations Act, against the Does and BorderWare;

    (f)    Awarding pre- and post-judgment interest; and

17

1159985.1

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

The Plaintiff hereby demands a trial by jury of all issues so triable.


Dated: September 18, 2006                    Respectfully Submitted,

                                             /s/ Joshua E. Menard
                                             Joshua E. Menard, NHBAR #15352
                                             PRETI FLAHERTY PLLP
                                             57 North Main Street
                                             P.O. Box 1318
                                             Concord, NH 03302-1318
                                             (603) 410-1500

                                             -and-

                                             Scott A. Kamber (NY 2506707)
                                             TO BE ADMITTED PRO HAC VICE
                                             Ethan Preston (IL 6278271)
                                             TO BE ADMITTED PRO HAC VICE
                                             KAMBER & ASSOCIATES, LLC
                                             19 Fulton Street, Suite 400
                                             New York, NY  10038
                                             Telephone: (877) 773-5469